Filed 4/17/23  P. v. Banuelos CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D080919 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FMB00647-2) |
| MARIO MONTES BANUELOS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Rodney A. Cortez, Judge.  Affirmed.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa A. Mandel, Seth M. Friedman and Joseph C. Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Mario Montes Banuelos guilty of two counts of first degree murder (Pen. Code, § 187, subd. (a))[1] and one count of premeditated attempted murder (§§ 187, subd. (a), 664, subd. (a)).  For the murder counts, the jury made true findings on special circumstances, including lying in wait (§ 190.2, subd. (a)(15)), and commission of murder during the course of a kidnapping (§ 190.2, subd. (a)(17)(B)).  For all of the counts, it made true findings that Banuelos personally used a firearm in the commission of the offenses (§ 12022.5, subd. (a)).  The trial court sentenced Banuelos to two terms of life without the possibility of parole, an indeterminate term of seven years to life, and a determinate term of 30 years.

Banuelos contends:  (1) the trial court erred in rejecting his objection that the prosecutor exercised peremptory challenges against prospective jurors in a discriminatory manner; (2) the jury instruction on conspiracy was erroneous; (3) the trial court was required to instruct, sua sponte, on (a) self-defense and defense of another, (b) voluntary manslaughter under a theory of imperfect self-defense, and (c) involuntary manslaughter; (4) defense counsel was ineffective for not requesting the jury to be instructed with CALCRIM No. 522, that provocation can reduce first degree murder to second degree murder; and (5) insufficient evidence supports the verdict.  We conclude that Banuelos's arguments lack merit, and we accordingly affirm the judgment.

I.

FACTUAL AND PROCEDURAL BACKGROUND

The murders and attempted murder at issue in this case were committed in April 1994, when three men were kidnapped, driven into the desert, shot multiple times, and then left for dead inside a vehicle.  One of the

---

[1]     Unless otherwise indicated, all further statutory references are to the Penal Code.

victims survived despite multiple gunshot wounds to his back and his neck. His testimony provided the central evidence against Banuelos at trial.

The surviving victim, T. Munoz, testified that in 1994 he was working as a driver for a man who sold methamphetamine, P. Cardenas. According to Munoz, Cardenas supplied methamphetamine to Banuelos's brother, Noe. Munoz was personally acquainted with Noe and Banuelos because both of them were present at certain drug-sale transactions. In April 1994, Noe owed Cardenas between $60,000 and $90,000.

On April 14, 1994, Noe contacted Munoz and Cardenas to tell them that he had the money to pay his debt. Munoz, Cardenas, and Munoz's brother, J., drove a van to the house in Coachella where Banuelos and Noe lived. When Munoz and Cardenas knocked on the door, Noe opened it and told them to wait outside because he was going to change his clothes. While they waited in the van, Munoz saw two men drive up to the house and go inside. Noe then invited Munoz and Cardenas to come inside and have a seat in the living room. J. waited in the van. Shortly thereafter, Noe pulled out a gun, pointed it at Munoz and Cardenas and told them not to move. As Munoz attempted to draw his own gun, Banuelos ran into the living room and hit Munoz in the face with the butt of a rifle. Munoz testified that he is certain the person who hit him with the rifle was Banuelos.

Next, Noe, Banuelos, and the two men who had earlier entered the house proceeded to deliver multiple kicks and blows to both Cardenas and Munoz. After the blows stopped, Munoz's arms were bound behind his back, and his eyes and his mouth were covered with tape. Munoz heard Banuelos state that there was someone else outside in the van, and Munoz's brother, J., was brought inside. Cardenas and J. were bound and restrained in a similar manner to Munoz.

3

Munoz, Cardenas, and J. were then taken outside and placed into the back of the van. Inside the van, Munoz heard the voices of Banuelos, Noe, and a third person whose voice he did not recognize. The van started moving and was underway for a considerable amount of time. During the drive, Munoz heard Banuelos tell someone to shoot. Munoz then felt a bullet hitting his back. A few minutes later he felt a second bullet hit his back and two bullets hit his left foot. He also heard two other shots that did not hit him. Likely because of the blood from Munoz's wounds, the tape binding his hands became loose, and he was able to free his hands and then lower the tape covering his eyes.

The van then entered a bumpy dirt road, and Munoz heard two more shots. Munoz also heard Banuelos saying that the bodies would be stinking when they were found, followed by laughter. From what he heard during the incident, Munoz believed that Banuelos was in charge because he was giving orders.

After approximately 10 minutes on the dirt road, the van came to a stop, and Munoz heard another vehicle pull up behind the van. Munoz then felt a hand over his nose and mouth, attempting to suffocate him. A voice outside of the van said, "Let's go." Munoz then heard Noe question someone about why he hadn't yet exited the van. Banuelos answered, "I'm suffocating him, but he won't die." Munoz was then shot two times in the back of his neck. He heard his assailants leave in the other vehicle, and he then lost consciousness.

Munoz woke up some time later in the van and made his way to the driver's seat, where he found the van's keys in the ignition. Munoz was able to drive himself to a highway and was pulled over at approximately 2:00 a.m. on April 15, 1994, by a law enforcement officer.

4

The officer who conducted the traffic stop found Munoz badly beaten and bloody. The dead bodies of Cardenas and J. were in the back of the van, with their hands still restrained and tape covering their eyes and mouths. They had both been shot once in the chest and once in the head.

At the scene, when the law enforcement officer asked Munoz who had hurt him, Munoz said and wrote down "Noe" and the name of the street in Coachella where Noe and Banuelos lived.

While speaking with a detective in the hospital three days later, Munoz identified Banuelos's first name, "Mario," as one of the perpetrators. Munoz subsequently identified Banuelos in a photographic lineup.

Warrants were issued for the arrest of both Banuelos and Noe, but they fled to Mexico immediately after the shootings. Noe was violently killed in Mexico in 2018. Banuelos was apprehended in 2019 at a border checkpoint between Mexico and Arizona.

An information charged Banuelos with the murders of Cardenas and J. (§ 187, subd. (a)), and the attempted murder of Munoz (§§ 187, subd. (a), 664, subd. (a)). The information also alleged special circumstances for the murder counts (§ 190.2, subds. (a)(3), (a)(15), (a)(17)(B)), alleged that the attempted murder was willful, deliberate and premeditated (§ 664, subd. (a)), and alleged that for each of the offenses, Banuelos personally used a firearm (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a)).

At trial, Munoz testified to the facts we have set forth above, specifically identifying Banuelos as one of the people who kidnapped and shot him, J., and Cardenas. Banuelos's defense was based primarily on his own testimony and that of one of his sisters. Banuelos testified that he was not involved with drugs, but he suspected that Noe was. Banuelos explained that he was kidnapped by Munoz and two other men approximately two weeks

5

prior to April 14, 1994, but was able to escape. According to Banuelos, the kidnappers asked him who he was and what his relation was to Noe. After the kidnapping, Noe told Banuelos he owed money to some people.

According to Banuelos, on April 14, 1994, he and Noe were in their living room when they heard a knock on the door. They looked outside and believed that the kidnappers had returned. Banuelos gathered up the women and children who lived in the house and told them to get into the bathroom. According to the testimony of both Banuelos and his sister, Banuelos stayed in the bathroom with the women and children while Noe dealt with the men who had knocked on the door. Banuelos and the others stayed in the bathroom until Noe told them it was safe to come out, stating "they will never bother us again." Banuelos testified that he had no involvement in the kidnapping and shooting of Munoz, J., and Cardenas.

During closing argument, defense counsel argued that the jury should not believe Munoz's testimony about what occurred, and that other than Munoz's account, there was no evidence that Banuelos was involved in the shootings.

The jury found Banuelos guilty on all three counts. It made a true finding on each of the special circumstances, including kidnapping and lying in wait, found that the attempted murder was willful, deliberate and premeditated, and found that Banuelos personally used a firearm in connection with each of the counts.

## II.

## DISCUSSION

A.  *The Trial Court Did Not Err in Concluding That Defense Counsel Failed to Make a Prima Facie Case That the Prosecutor Exercised Peremptory Strikes of Jurors in a Discriminatory Manner*

We first consider Banuelos's contention that the trial court erred in denying his objection, during jury selection, that the prosecutor was exercising his peremptory challenges in a discriminatory manner.

1.  *Applicable Legal Standards*

We begin with the applicable legal standards. "Both the state and federal Constitutions prohibit the use of peremptory strikes to remove prospective jurors on the basis of group bias." (*People v. Scott* (2015) 61 Cal.4th 363, 383 (*Scott*).) "Excluding by peremptory challenge even 'a single juror on the basis of race or ethnicity is an error of constitutional magnitude.' " (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1172.)

The "familiar *Batson/Wheeler* inquiry" governs a trial court's evaluation of whether a party impermissibly exercised peremptory challenges in violation of the state and federal constitutions. (*Scott*, *supra*, 61 Cal.4th at p. 383, citing *Batson v. Kentucky* (1986) 476 U.S. 79 and *People v. Wheeler* (1978) 22 Cal.3d 258.) That inquiry "consists of three distinct steps. First, the opponent of the strike must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose in the exercise of peremptory challenges. Second, if the prima facie case has been made, the burden shifts to the proponent of the strike to explain adequately the basis for excusing the juror by offering permissible, nondiscriminatory justifications. Third, if the party has offered a nondiscriminatory reason, the trial court must decide whether the opponent

7

of the strike has proved the ultimate question of purposeful discrimination." (*Scott*, at p. 383.) Absent a prima facie showing, a prosecutor is not required to offer an explanation for the exercise of a peremptory challenge. (*People v. Panah* (2005) 35 Cal.4th 395, 442.) " '[T]here "is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination." ' " (*People v. Armstrong* (2019) 6 Cal.5th 735, 766.)

Here, as we will explain, the trial court concluded its inquiry at the first step when it determined that defense counsel failed to make a prima facie case. "A prima facie case of racial discrimination in the use of peremptory challenges is established if the totality of the relevant facts ' "gives rise to an inference of discriminatory purpose." ' " (*Scott, supra,* 61 Cal.4th at p. 384.) " '[I]n the ordinary case . . . to make a prima facie case after the excusal of only one or two members of a group is very difficult.' " (*People v. Clark* (2016) 63 Cal.4th 522, 567 (*Clark*).) However, "[t]he ultimate issue is not whether there is a pattern of systematic exclusion, but instead ' " 'whether a particular prospective juror has been challenged because of group bias.' " ' " (*People v. Battle* (2021) 11 Cal.5th 749, 773 (*Battle*).)

In determining whether a prima facie case has been made, "[c]ertain types of evidence are especially relevant . . . , including whether the prosecutor has struck most or all of the members of the venire from an identified group, whether a party has used a disproportionate number of strikes against members of that group, whether the party has engaged prospective jurors of that group in only desultory voir dire, whether the defendant is a member of that group, and whether the victim is a member of the group in which the majority of the remaining jurors belong. [Citation.] We may also consider nondiscriminatory reasons for the challenged strikes

8

that are 'apparent from and "clearly established" in the record.' [Citation.] Yet we may do so only when these reasons 'necessarily dispel any inference of bias,' such that ' "there is no longer any suspicion . . . of discrimination in those strikes." ' " (*Battle, supra*, 11 Cal.5th at p. 773.)

"Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions." (*People v. Lenix* (2008) 44 Cal.4th 602, 613.)

In his appellate briefing, Banuelos points out that, effective January 1, 2021, the Legislature enacted Code of Civil Procedure section 231.7, which codifies the principle that "[a] party shall not use a peremptory challenge to remove a prospective juror on the basis of the prospective juror's race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or the perceived membership of the prospective juror in any of those groups." (Code Civ. Proc., § 231.7, subd. (a); Stats. 2020, ch. 318.) Code of Civil Procedure section 231.7 details a specific procedure that a trial court must follow in considering a party's objection to the discriminatory use of a peremptory challenge. That procedure differs from the familiar three-step framework described in our Supreme Court's case law for considering constitutional challenges, which we have set forth above. (See, e.g., *Scott, supra*, 61 Cal.4th at p. 383.) Moreover, the newly-enacted statute provides that "[a] motion brought under this section shall also be deemed a sufficient presentation of claims asserting the discriminatory exclusion of jurors in violation of the United States and California Constitutions." (Code Civ. Proc., § 231.7, subd. (d)(1).)

Under Code of Civil Procedure section 231.7, there is no requirement that the objector first make a prima facie case. Instead, the statute provides that "upon objection to the exercise of a peremptory challenge pursuant to

9

this section, the party exercising the peremptory challenge shall state the reasons the peremptory challenge has been exercised. [¶] . . . The court shall evaluate the reasons given to justify the peremptory challenge in light of the totality of the circumstances." (Code Civ. Proc., § 231.7, subds. (c), (d)(1).) The statute contains other provisions relevant to a trial court's analysis, including a listing of 13 presumptively invalid reasons for the exercise of a peremptory challenge. (*Id.*, § 231.7, subd. (e).) It also provides that "[t]he denial of an objection made under this section shall be reviewed by the appellate court de novo, with the trial court's express factual findings reviewed for substantial evidence." (*Id.*, § 231.7, subd. (j).)

Banuelos argues that Code of Civil Procedure section 231.7 applies to his case based on the retroactivity principle set forth in *In re Estrada* (1965) 63 Cal.2d 740. " 'The *Estrada* rule rests on an inference that, *in the absence of contrary indications*, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.' " (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 308 (*Lara*), italics added.) Importantly, however, "[b]ecause the *Estrada* rule reflects a presumption about legislative intent, rather than a constitutional command, the Legislature . . . may choose to modify, limit, or entirely forbid the retroactive application of ameliorative criminal-law amendments if it so chooses. Thus, . . . the presumption does not govern when the statute at issue includes a 'saving clause' providing that the amendment should be applied only prospectively." (*People v. Conley* (2016) 63 Cal.4th 646, 656.)

Here, without even reaching the question of whether Code of Civil Procedure section 231.7 effectuates "ameliorative changes to the criminal law" presumed to have retroactive application (*Lara, supra*, 4 Cal.5th at

10

p. 308), we reject Banuelos's contention that Code of Civil Procedure section 231.7 applies retroactively to his case because the Legislature clearly set forth a contrary indication. Subdivision (i) of the statute states, "This section applies in all jury trials in which jury selection begins on or after January 1, 2022." (Code Civ. Proc., § 231.7, subd. (i).) Banuelos's trial took place before that date, namely in April 2021.[2] Thus, Code of Civil Procedure section 231.7 does not apply. (See *People v. Collins* (2021) 60 Cal.App.5th 540, 550, fn. 6 [declining to rely on Code Civ. Proc., § 231.7 to decide the appeal, noting the statute specifies that it applies only to trials in which jury selection began on or after January 1, 2022].)

    2.     *Relevant Trial Court Proceedings*

---

[2]     In an October 3, 2022 letter, filed after the completion of the parties' appellate briefing, counsel for Banuelos notified us of new authority that he views as applicable to the issue of whether Code of Civil Procedure section 231.7 applies retroactively to this case. Specifically, counsel brings to our attention an amendment to section 745, effective January 1, 2023. Section 745 provides, among other things, that "[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin," and it allows a defendant alleging a violation to file a motion in the trial court or to seek post-conviction relief. (§ 745, subds. (a), (b).) The amendment that counsel cites in his letter amended section 745, as of January 1, 2023, to state that it applies to all cases not yet final on appeal. (*Id*., subd. (j)(1).) However, counsel's letter is puzzling because section 745 has nothing to do with the retroactive application of Code of Civil Procedure section 231.7 and does not pertain to the procedures for evaluating objections to the exercise of peremptory challenges. Moreover, *even if* section 745 was somehow relevant here, the amendment that counsel brings to our attention is not material because even under the *former* version of section 745 (effective from January 1, 2021 to December 31, 2022), the statute was prospectively applicable to cases, like Banuelos's, "in which judgment has not been entered prior to January 1, 2021." (Former § 745, subd. (j).)

11

Having discussed the applicable legal principles, we next turn to the relevant trial court proceedings. During jury selection, defense counsel raised an objection, stating "I believe there is a pattern here of excluding non-white people, my client being Mexican." Defense counsel specifically identified the prosecutor's exclusion of (1) prospective juror No. 24, who was Hispanic; (2) prospective juror No. 37—a "young gentleman with the very long hair" whose race and ethnicity is not reflected in the record;[3] and (3) a prospective juror, whose juror number was not identified, but whom defense counsel described as "the African American gentleman, our only African American gentleman." Defense counsel stated, "I want to make a record of it because I think it is a pattern or at least showing itself as a pattern." When asked whether he wished to reply, the prosecutor stated that he did not agree with defense counsel's assertion but otherwise did not wish to reply unless the trial court determined that defense counsel made a prima facie showing.

The trial court then overruled the objection, stating, "At this point, I don't see that there is a prima facie showing [of] excusals based on race issues. I'm going to deny the motion . . . ." The trial court explained, "From what I have observed, I believe that we have a Hispanic woman that is currently sitting [i]n the box, and the ones that he excluded, honestly, based on their answers, I would have excluded, too, but it didn't rise to the level [of] for cause. I know that [the prosecutor] did ask for one of them. I believe you

---

[3]     Banuelos's appellate brief states that prospective juror No. 37 was a "Hispanic juror." However, nothing in the record supports that assertion. Appellate counsel's description of prospective juror No. 37 is further suspect because Banuelos's appellate briefing twice refers to prospective juror No. 37 *as female*, although it is clear from comments made in the trial court that the prospective juror was a "young gentleman."

[prosecutor] had asked for Number 24 to be excused for cause, but from the get-go, even on his questionnaire, he said he didn't want to be here."[4]

With respect to prospective juror No. 24, the trial court was referring to the fact that on his questionnaire, he twice wrote "just don't want to." Specifically, he wrote that response to the following questions: (1) "Do you wish to be excused from jury service for any other reason?" and (2) "If you wish to have your jury service deferred for any reason (school, vacation, business trip), please indicate the reason and when you will next be available to serve."

On appeal, Banuelos argues that the trial court erred in determining that defense counsel did not make a prima facie case that the prosecutor acted with discriminatory intent.

As an initial matter we note that, at trial, defense counsel's objection was that the prosecutor was challenging "non-white" jurors. As we have explained, the record reflects that one of the challenged jurors was Black and one was Hispanic. The third juror's race and ethnicity was not reflected in the record. The most we are able to glean from the record is that he was "non-white," as defense counsel placed him in the group of "non-white" jurors challenged by the prosecutor.

In order to make a prima facie case in a *Batson/Wheeler* motion, defense counsel was required to identify a cognizable class that the prosecutor was targeting with his peremptory challenges. "Prospective jurors may not be excluded from jury service based solely on the presumption that they are biased because they are *members of an identifiable group*

---

[4]    The trial court was apparently mistaken about the prosecutor having challenged prospective juror No. 24 for cause, as the record does not reflect any such challenge.

13

distinguished on racial, religious, ethnic, or similar grounds." (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1122, italics added.) "Motions under *Wheeler* and *Batson* protect against the systematic exclusion of *distinctive and protected groups* from the jury pool." (*People v. Armstrong* (2019) 6 Cal.5th 735, 768, italics added.) Thus, "the moving party[ ] has the burden of establishing the challenged jurors *are members of a cognizable class*." (*Ibid.*, italics added.)

Defense counsel's objection that the prosecutor had challenged "non-white" jurors was insufficient to create a prima facie case for a *Batson/Wheeler* motion because "non-white" persons is not a cognizable class. Specifically, our Supreme Court has expressly rejected the proposition that "people of color" or "minorities" are cognizable classes for purposes of a *Batson/Wheeler* motion. (*People v. Davis* (2009) 46 Cal.4th 539, 583 ["No California case has ever recognized 'people of color' as a cognizable group."]; *People v. Manibusan* (2013) 58 Cal.4th 40, 83 ["Both this court and others have declined to recognize 'minority jurors' as a cognizable group for purposes of a claim that the prosecution has excused a prospective juror for discriminatory reasons."]; see also *People v. Neuman* (2009) 176 Cal.App.4th 571, 579 [the trial court properly ruled "that 'people of color' is not a cognizable group"].) The category of "non-white" persons, which is simply another way of saying "people of color," suffers from the same problem. (See *United States v. Suttiswad* (9th Cir. 1982) 696 F.2d 645, 649 [in the context of addressing the racial composition of grand juries, the court observed that the proposed category of "non-whites" is not a cognizable or distinctive group because it "would have no internal cohesion, nor would it be viewed as an identifiable class by the general population."].)

14

On appeal, Banuelos ignores the fact that defense counsel objected to the removal of "non-white" jurors. Instead, he argues that defense counsel made a prima facie showing that the prosecutor made "subtle efforts . . . to remove Hispanic jurors," and "was using peremptories selectively to exclude Hispanic jurors." As we will explain, even assuming, without deciding, that the objection was sufficiently raised in the trial court to be cognizable on appeal, it lacks merit.

As discussed, the record does not indicate the race or ethnicity of prospective juror No. 37. As the moving party in a *Batson/Wheeler* motion, it was Banuelos's burden to make a record about the race of the relevant prospective jurors. (*People v. Morris* (2003) 107 Cal.App.4th 402, 408 [defendant could not demonstrate error when the record did not indicate the race of prospective jurors].) The only Hispanic juror shown by the record to have been peremptorily challenged by the prosecutor is prospective juror No. 24. To the extent Banuelos is attempting to point to a pattern of removing Hispanic jurors to create a prima facie case, the exercise of a peremptory challenge against a single prospective Hispanic juror certainly does not create a pattern. (*Clark*, *supra*, 63 Cal.4th at p. 567 [" '[I]n the ordinary case . . . to make a prima facie case after the excusal of only one or two members of a group is very difficult.' "].) That is especially the case where, as here, another Hispanic juror remained on the jury panel.[5]

Banuelos also attempts to establish a prima facie case of discriminatory removal of Hispanic jurors by pointing to the fact that the prosecutor asked

[5] The trial court specifically memorialized for the record that "[w]hen we were in chambers . . . the Court did reference a juror that the court believes that remained on the panel that was Hispanic, and I didn't have the number with me at the time, that is juror in Seat 3, Number 44, JUROR NUMBER 44."

prospective juror No. 24 whether he would rely on the interpreter's translation for a Spanish-speaking witness, even if he disagreed with the translation. Banuelos's brief asserts, in bold font, "Juror 24 was the only prospective juror to be asked such a question." (Bolding omitted.) However, as the People point out, that representation is clearly wrong, as shown by even a cursory look at the reporter's transcript. During voir dire, the prosecutor asked many other venire members the same question after they identified themselves as being able to speak Spanish, including one prospective juror who jokingly described himself as "the white guy who speaks Spanish." The prosecutor also asked non-Spanish speaking venire members how they would react to having to rely on a translation. The prosecutor repeatedly explained to the prospective jurors exactly why he was asking them about the impact of experiencing witness testimony through an interpreter: the People's main witness (i.e., Munoz), was expected to give extensive testimony, all of which would be in Spanish. Under the circumstances, there is nothing suspect about the prosecutor's focus on that topic during voir dire. Thus, the questioning of prospective juror No. 24 about how he would handle listening to translated Spanish-language testimony does not qualify as the type of "desultory voir dire" directed toward a certain group, which might raise an inference of discrimination. (*Battle*, *supra*, 11 Cal.5th at p. 773.) The record simply contains no support for Banuelos's contention that the prosecutor's questioning of venire members (including prospective juror No. 24) about their ability to rely on an interpreter's translation raises an inference that prospective juror No. 24 was challenged because he is Hispanic.

Further, our Supreme Court has explained that "where the record reveals '*obvious* race-neutral grounds for the prosecutor's challenges to the

prospective jurors in question,' those reasons can definitively undermine any inference of discrimination that an appellate court might otherwise draw from viewing the statistical pattern of strikes in isolation. [Citations.] Put differently, when the record of a prospective juror's voir dire or questionnaire on its face reveals a race-neutral characteristic that any reasonable prosecutor trying the case would logically avoid in a juror, the inference that the prosecutor was motivated by racial discrimination loses force." (*People v. Rhoades* (2019) 8 Cal.5th 393, 431.) Here, the trial court expressly identified a race-neutral characteristic that any reasonable prosecutor would arguably want to avoid in a juror. Specifically, prospective juror No. 24 twice stated on his questionnaire that he "just [didn't] want to" serve on the jury. For this reason, too, we conclude that substantial evidence supports the trial court's conclusion that defense counsel failed to make a prima facie case that, in exercising a peremptory strike against prospective juror No. 24, the prosecutor acted for discriminatory reasons based on Hispanic ethnicity.

B.  *There Was No Instructional Error as to the Requirement of Unanimity Regarding the Object of the Conspiracy*

We next consider Banuelos's challenge to the trial court's instructing of the jury with CALCRIM No. 416, which instructs on how to determine whether Banuelos was a member of a conspiracy. "A claim of instructional error is reviewed de novo." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579 (*Mitchell*).)[6]

---

[6] Defense counsel did not object to the jury instruction at issue here. In most circumstances, failure to object to an instruction results in the forfeiture of an appellate challenge. (*Mitchell, supra*, 7 Cal.5th at p. 579.) However, because failure to object to instructional error will not result in forfeiture if the substantial rights of the defendant are impacted (*ibid.*), we exercise our discretion to consider the appellate challenge.

At trial, one of the theories of criminal liability relied upon by the People was that Banuelos participated in a conspiracy to commit kidnapping and murder. Without objection from defense counsel, the trial court instructed with CALCRIM No. 416. In relevant part, the jury was instructed:

> "The People have presented evidence of a conspiracy. A member of a conspiracy is criminally responsible for the acts or statements of any other member of the conspiracy done to help accomplish the goal of the conspiracy.
>
> "To prove that the defendant was a member of a conspiracy in this case, the People must prove that:
>
> "1.     The defendant intended to agree and did agree with [Noe] or other two unidentified males to commit Kidnapping and Murder;
>
> "2.     At the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit Kidnapping and Murder;
>
> "3.     The defendant or [Noe] or the other two unidentified males committed at least one of the following overt acts to accomplish Kidnapping and Murder:
>
> "a.  Armed themselves with firearms
>
> "b.  Bound the victims,
>
> "c.  Put victims in van,
>
> "d.  Drove victims to remote location;
>
> "AND
>
> "4.     At least one of these overt acts was committed in California.
>
> [¶] . . . [¶]

"The People contend that the defendant conspired to commit one of the following crimes:  Kidnapping and Murder.  You may not find the defendant guilty under a conspiracy theory unless all of you agree that the People have proved that the defendant conspired to commit at least one of these crimes, and you all agree which crime he conspired to commit."

Banuelos takes issue with the final sentence set forth above. Specifically, he argues that instead of stating "You *may not* find the defendant guilty under a conspiracy theory unless all of you agree that the People have proved that the defendant conspired to commit at least one of these crimes, and you all agree which crime he conspired to commit," the sentence should have stated, "You *must not* find the defendant guilty under a conspiracy theory unless all of you agree that the People have proved that the defendant conspired to commit at least one of these crimes, and you all agree which crime he conspired to commit."[7]

Focusing solely on the word "may" in the two-word phrase "may not," Banuelos argues that "[t]he use of the word 'may' in a jury instruction is interpreted as permissive, not mandatory."  He argues, "The case law is clear that when an unanimity instruction is required, it is not an instruction to the jury about whether or not they may do something.  It is mandatory that the jury unanimously agree on which crime the prosecution actually proved beyond a reasonable doubt.  Providing the jury with a permissive unanimity jury instruction diluted the prosecution's burden of proving the appellant

---

7    The phrase "may not," as used by the trial court here, is taken verbatim from CALCRIM No. 416 as approved by the Judicial Council.  In contrast, as Banuelos points out, the Judicial Council chose to use the phrase "must not" in the general unanimity instructions set forth in CALCRIM Nos. 3500 and 3501, both of which state "[y]ou *must not* find the defendant guilty unless . . . ."  (Italics added.)

committed either target crime or both because it allowed the jury to essentially disregard the unanimity instruction, given its erroneous permissive language." According to Banuelos, in light of the use of the word "may" in the instruction, the jury "could have divided on which target offense was intended" or could have "completely ignored" the "permissive" instruction.

We reject the argument because it overlooks the plain commonsense meaning of the two-word phrase "may not." Although the word "may" *standing alone* indicates that something is optional and permissive, the two-word phrase "may not," as used in this context, indisputably has the same meaning as "must not." As case law explains, "[g]enerally speaking, 'the word "may" is permissive—you can do it if you want, but you aren't being forced to." (*Woolls v. Superior Court* (2005) 127 Cal.App.4th 197, 208.) However " '[m]ay not' is prohibitory, as opposed to permissive." (*Id.* at p. 209.) Thus, telling the jurors that they "may not" find the defendant guilty unless they all agree, is the same thing as telling the jurors that they "must not" find the defendant guilty unless they all agree.[8] We therefore find no merit to Banuelos's argument that the jury instruction was erroneous because it used the phrase "may not" rather than "must not."[9]

_____

[8] Indeed, as the People point out, the phrases "may not" and "must not" are so interchangeable that the reporter's transcript reflects that the trial court used the phrase "must not" rather than "may not" when reading CALCRIM No. 416 to the jury.

[9] Banuelos also appears to argue that CALCRIM No. 416 is flawed because the unanimity instruction is placed at the end of the instruction and is "buried underneath all the other instructions." We reject the argument, as "[j]urors are presumed able to understand and correlate instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

C. *The Trial Court Did Not Err in Failing to Sua Sponte Instruct on the Theories of Self-Defense and Defense of Another*

We next turn to Banuelos's contention that the trial court erred in not sua sponte instructing on self-defense and defense of another. Banuelos argues, "[T]he jury could have rejected Banuelos'[s] testimony that he was in the [bathroom] and could have found he was involved in the confrontation that led to the underlying charges. Under these circumstances, instructions on self-defense and defense of others were warranted. . . . Although there had not yet been an actual physical attack, there was evidence the men [i.e., Cardenas, Munoz] were armed and prepared to kill over this drug debt when they entered the Banuelos' home. As such, there was substantial evidence to have warranted the giving of instructions on self-defense and defense of others."[10] " '[A] claim that a court failed to properly instruct on the applicable principles of law is reviewed de novo.' " (*People v. Dearborne* (2019) 34 Cal.App.5th 250, 260.)

The requirements for self-defense and defense of another, in the context of a homicide trial, are set forth in CALCRIM No. 505, Justifiable Homicide: Self-Defense or Defense of Another. The requirements include: (1) the defendant reasonably believed that he or someone else was in imminent

_____

[10] Banuelos also argues that *even if* he was in the bathroom the entire time, the theory of self-defense and defense of another also applies because "there was substantial evidence that Noe had killed Cardenas and [J.] and shot Munoz in an effort to protect Banuelos and the family who were hiding from these men in the bathroom." The argument is nonsensical because if the jury believed that Banuelos was in the bathroom the entire time, there would be no need for him to rely on the theory of self-defense or defense of another, as he would be acquitted on the ground that he was not involved in the crimes.

21

danger of being killed or suffering great bodily injury; (2) the defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger; and (3) the defendant used no more force than was reasonably necessary to defend against that danger. (CALCRIM No. 505.) "To satisfy the imminence requirement, '[f]ear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury. " '[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. An imminent peril is one that, from appearances, must be instantly dealt with.' " ' " (*People v. Trujeque* (2015) 61 Cal.4th 227, 270 (*Trujeque*), italics omitted.)

" 'A trial court's duty to instruct, sua sponte, on particular defenses arises " 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " ' " (*People v. Martinez* (2010) 47 Cal.4th 911, 953 (*Martinez*).) "[T]o require trial courts to ferret out all defenses that might possibly be shown by the evidence, even when inconsistent with the defendant's theory at trial, would not only place an undue burden on the trial courts but would also create a potential of prejudice to the defendant." (*People v. Barton* (1995) 12 Cal.4th 186, 197.) Both self-defense and defense of another fall under this rule. (See *People v. Elize* (1999) 71 Cal.App.4th 605, 615 [self-defense]; *People v. Randle* (2005) 35 Cal.4th 987, 994 [self-defense and defense of another are "related concepts"].) Applying these principles, the trial court did not have a sua sponte duty to instruct on self-defense or defense of another.

First, with respect to the theories of either self-defense or defense of another, sua sponte instructions were not required on the basis that the " ' " 'defendant [was] relying on such a defense.' " ' " (*Martinez*, *supra*, 47 Cal.4th at p. 953.)  As we have explained, the theory of Banuelos's defense was that he was not involved, *to any extent*, in the shootings, not that he committed the shootings in self-defense or defense of another.  Specifically, Banuelos testified that he was in the bathroom during the entire incident.  Similarly, defense counsel argued that, because Munoz's testimony was not credible, the People failed to prove Banuelos was involved in the shootings.

Second, the trial court was not required to instruct on self-defense or defense of another because there was no " ' " 'substantial evidence supportive of such a defense and the defense [was] . . . inconsistent with the defendant's theory of the case.' " ' " (*Martinez*, *supra*, 47 Cal.4th at p. 953.)  Substantial evidence was lacking because self-defense or defense of another are viable defenses only if the defendant perceived the danger posed by the victim to be *imminent*.  (CALCRIM No. 505; *Trujeque*, *supra*, 61 Cal.4th at p. 270.)  Here, assuming the jurors believed that Banuelos was involved in the shootings rather than hiding in the bathroom, there would not be substantial evidence that Banuelos acted in self-defense or defense of another in shooting Cardenas, Munoz, and J. because, at the time they were shot, Cardenas, Munoz, and J. were tied up in the back of the van.  Persons whose arms are bound behind them and have tape covering their eyes and mouths do not pose a danger that is " ' " 'immediate and present and not prospective or even in the near future' " ' " and that " ' " 'must be instantly dealt with.' " ' " (*Trujeque*, at p. 270, italics omitted.)  Moreover, instructions on self-defense and defense of another would have been " ' " 'inconsistent with [Banuelos's] theory of the case. ' " ' " (*Martinez*, at p. 953.)  As we have explained, the

23

defense theory was that Banuelos was not involved in the shootings. Therefore, it would be inconsistent for him to claim that he *did* commit the shootings but that he did so to defend himself or another person.

D.    *The Trial Court Did Not Err in Failing to Sua Sponte Instruct on the Lesser Included Offense of Voluntary Manslaughter Under a Theory of Imperfect Self-Defense*

In a similar argument, Banuelos contends that the trial court should have sua sponte instructed that the jury had the option of returning verdicts of voluntary manslaughter (or attempted voluntary manslaughter for Munoz) based on the theory of imperfect self-defense.

"An instance of imperfect self-defense occurs when a defendant acts in the actual but unreasonable belief that he or she is in imminent danger of great bodily injury or death. [Citation.] Imperfect self-defense differs from complete self-defense, which requires not only an honest but also a reasonable belief of the need to defend oneself. [Citation.] It is well established that imperfect self-defense is not an affirmative defense. [Citation.] It is instead a shorthand way of describing one form of voluntary manslaughter. [Citation.] Because imperfect self-defense reduces an intentional, unlawful killing from murder to voluntary manslaughter by negating the element of malice, this form of voluntary manslaughter is considered a lesser and necessarily included offense of murder." (*People v. Simon* (2016) 1 Cal.5th 98, 132 (*Simon*).)

"A trial court has a sua sponte duty to instruct the jury on a lesser included uncharged offense if there is substantial evidence that would absolve the defendant from guilt of the greater, but not the lesser, offense. . . . Substantial evidence is evidence from which a jury could conclude beyond a reasonable doubt that the lesser offense was committed. . . . [¶] We review

24

de novo a trial court's decision not to give an imperfect self-defense instruction." (*Simon*, *supra*, 1 Cal.5th at pp. 132-133.)

Like the doctrine of self-defense, which we have discussed above, imperfect self-defense is a viable theory only if the defendant had an "actual . . . belief that he or she is in *imminent* danger of great bodily injury or death." (*Simon*, *supra*, 1 Cal.5th at p. 132, italics added; see also *People v. Butler* (2009) 46 Cal.4th 847, 868 ["self-defense . . . , whether perfect or imperfect, require[s] an actual fear of *imminent* harm"].) Here, as we have already explained with respect to the theory of self-defense, there was no substantial evidence presented at trial that Banuelos could have believed he was in imminent danger of great bodily injury while committing the shootings. The victims were all tied up and restrained in the back of the van and thus posed no immediate threat. Accordingly, the trial court had no sua sponte duty to instruct on the lesser included offense of voluntary manslaughter (or attempted voluntary manslaughter) under a theory of imperfect self-defense.

E. *The Trial Court Did Not Err in Failing to Instruct on Involuntary Manslaughter*

Banuelos next contends that the trial court should have instructed on the lesser included offense of involuntary manslaughter.

Manslaughter is defined by statute as "the unlawful killing of a human being *without malice*." (§ 192, italics added.) Involuntary manslaughter, in turn, is defined as an unlawful killing "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (*Id.*, subd. (b).) As we have explained, a trial court must instruct on all lesser included offenses supported by substantial evidence. (*Simon*, *supra*, 1 Cal.5th at p. 132.)

Under the argument heading asserting that an involuntary manslaughter instruction was required, Banuelos argues, "The evidence was clear that although deadly force was used resulting in the death of two individuals, the evidence was murky as to whether that use of deadly force was done with premeditation and deliberation. . . . Given the fact that the evidence showed a real possibility of neither Noe nor [Banuelos] having any intent to kill but rather to defend themselves and each other, had the jury been instructed on the lesser included offense of involuntary manslaughter, it is very reasonably likely the jury would have found [Banuelos] did not act with the required malice aforethought necessary for first-degree murder. However, the jury was not instructed here."[11]

Banuelos presents no coherent argument how any reasonable juror could have concluded, based on the evidence, that the shootings were committed *without malice* to support an instruction on involuntary manslaughter. (§ 192.) Malice can be either express or implied. (§ 188, subd. (a).) "Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (*Id.*, subd. (a)(1).) "[M]alice is implied when the killing resulted from an intentional act, the natural consequences of which are dangerous to human life, performed with knowledge of and conscious disregard for the danger to human life." (*People v. Thomas* (2012) 53 Cal.4th 771, 814.) Here, the victims were shot at close range multiple times—in the torso, neck, and head—while they were tied up in the back of a van. Most reasonable jurors would conclude that repeatedly

---

11 In the course of his argument, Banuelos also contends that "the jury was given an 'all or nothing' choice of acquitting Banuelos entirely or convicting him of first-degree murder." That is plainly not true. The jurors were given the option of convicting Banuelos of second degree murder, but they chose not to do so.

shooting someone at close range in the head, neck and torso indicates an intent to kill, constituting express malice. At a minimum, such a course of conduct indisputably poses a grave danger to human life constituting implied malice. (*Thomas,* at p. 815 [pointing a loaded gun at the victim's head and threatening to shoot him "is highly dangerous and exhibits a conscious disregard for life."].)[12] We therefore reject Banuelos's contention that the trial court was required, sua sponte, to instruct on the lesser included offense of involuntary manslaughter.

F.    *Banuelos Has Not Established That Defense Counsel Was Ineffective By Failing to Request an Instruction on Provocation*

Banuelos argues that defense counsel was ineffective because he did not request that the jury be instructed with CALCRIM No. 522 that provocation may reduce first degree murder to second degree murder.[13]

We begin with the instruction that Banuelos contends should have been requested by defense counsel. As relevant here, CALCRIM No. 522 provides: "Provocation may reduce a murder from first degree to second degree . . . . The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked,

---

[12]    In his reply brief, Banuelos takes a different approach, arguing that an instruction on involuntary manslaughter was warranted because the evidence permitted a finding that he acted in self-defense, defense of another, or imperfect self-defense. However, those theories either provide a complete defense (in the case of self-defense or defense of another) or serve to support a verdict of voluntary manslaughter (in the case of imperfect self-defense). (*People v. Elmore* (2014) 59 Cal.4th 121, 133-134.) Thus, they do not support an instruction on involuntary manslaughter.

[13]    Provocation that causes a defendant to act in the heat of passion can also serve to reduce murder to voluntary manslaughter (*People v. Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*)), but Banuelos does not argue that counsel should have requested an instruction on that theory.

27

consider the provocation in deciding whether the crime was first or second degree murder." As case law explains, "Second degree murder is an unlawful killing with malice, but without the elements of premeditation and deliberation which elevate the killing to first degree murder. . . . To reduce a murder to second degree murder, premeditation and deliberation may be negated by heat of passion arising from provocation. . . . If the provocation would not cause an average person to experience deadly passion but it precludes the defendant from subjectively deliberating or premeditating, the crime is second degree murder." (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332 (*Hernandez*), citations omitted.) "[A] subjective test applies to provocation as a basis to reduce malice murder from the first to the second degree: it inquires whether the defendant in fact committed the act because he was provoked." (*People v. Jones* (2014) 223 Cal.App.4th 995, 1000.) An instruction that provocation may reduce first degree murder to second degree murder is a "pinpoint instruction that need not be given on the court's own motion." (*People v. Rogers* (2006) 39 Cal.4th 826, 880.)

We evaluate Banuelos's ineffective assistance claim based on well-settled standards. A criminal defendant is constitutionally entitled to effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668, 684-686; *People v. Doolin* (2009) 45 Cal.4th 390, 417.) To establish ineffective assistance, "the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013)

57 Cal.4th 986, 1009 (*Mai*).) "It is defendant's burden to demonstrate the inadequacy of trial counsel." (*People v. Lucas* (1995) 12 Cal.4th 415, 436.)

"It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Mai, supra*, 57 Cal.4th at p. 1009.)

Here, Banuelos has failed to meet his burden on direct appeal to establish ineffective assistance because defense counsel could have had a rational tactical purpose for failing to request an instruction on provocation. Specifically, as we have explained, Banuelos's defense was based on the theory that he was not involved in the shootings. An instruction that Banuelos acted with provocation in shooting the victims would have conflicted with Banuelos's defense because it would have suggested to the jury that Banuelos *was in fact a participant in the shootings*. Under those circumstances, counsel could have made a rational tactical decision to forego the provocation instruction. (See *People v. Wader* (1993) 5 Cal.4th 610, 643 [the court could not "say that defense counsel had no rational tactical purpose in not requesting an instruction on intoxication" when it "would have been inconsistent with defendant's theory of the case"].)

G.    *Banuelos's Challenge to the Sufficiency of the Evidence Lacks Merit*

Banuelos's final contention is that insufficient evidence supports his convictions on each of the three counts. The argument is premised on the theory that the *only* finding a reasonable juror could have made based on the

evidence was that Banuelos acted in self-defense, defense of another, imperfect self-defense, or based on provocation. Specifically, Banuelos sets forth the following argument: "Here, no rational juror could have found proof beyond a reasonable doubt that [Banuelos] intended to kill Cardenas and [J.] unlawfully—that Noe did not shoot Cardenas and [J.] in the actual belief in the need for self-defense or in defense of the family, whether reasonable or not, nor in the heat of passion on adequate provocation. And no rational juror could have found proof beyond a reasonable doubt that [Banuelos] initiated a chain of events which proximately caused Cardenas's and [J.'s] death. [¶] No rational juror could have found proof beyond a reasonable doubt that Noe did not act in self-defense or in defense of [Banuelos] and their sisters and children."

The entirety of Banuelos's discussion of the *evidence* in support of his argument consists of the following: "Cardenas, Munoz and [J.] were the aggressors; they arrived at the Banuelos['] [home] armed and intent on collecting a drug debt. As such, there was insufficient evidence to support murder convictions and an attempted murder conviction against [Banuelos] . . . ."

We reject the argument. Here, the evidence certainly did not *compel* the conclusion that Banuelos acted in self-defense, defense of another, or imperfect self-defense. Indeed, as we have discussed above, there is no substantial evidence to support the theories of self-defense, defense of another, and imperfect self-defense because there was simply no imminent threat posed by the victims at the time they were shot. (§§ II.C, II.D, *ante*.) Further, to the extent Banuelos is arguing that a verdict of second degree murder or voluntary manslaughter was *compelled* by the evidence because he was provoked to shoot the victims (*Hernandez*, *supra*, 183 Cal.App.4th at

30

p. 1332; *Beltran, supra*, 56 Cal.4th at p. 942), the record certainly does not support that argument. Munoz testified that the victims were ambushed in Banuelos's living room without engaging in any provocatory conduct, and the jury was entitled to credit that testimony.

## DISPOSITION

The judgment is affirmed.


IRION, J.

WE CONCUR:


HUFFMAN, Acting P. J.


BUCHANAN, J.